Counsel of Record:

James A. Kidney
U.S. Securities & Exchange Commission
100 F Street, N.E.
Washington, DC 20549-5949
Telephone: (202) 551-4441
Attorney for Plaintiff
Securities and Exchange Commission

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br>           v.<br>JOHN R. EASOM,<br>WILLIAM ECHEVERRI,<br>RORY E. TRINGALI,<br>ROBERT MIKETICH,<br>VICTOR H. ECHEVERRI,<br>JOSEPH F. MANCUSO,<br>PAUL S. QASSIS,<br>and<br>GARY S. SAGGU<br>                              Defendants | Case No.<br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

The Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY OF THE ACTION

1.     There are eight defendants to this action: John R. Easom, 103 Gaston Ave.,

Garfield, NJ 07026; William Echeverri, 66 Ridge Ave., Park Ridge, NJ 07656; Rory E.

Tringali, 48 Walter Ave., Hicksville, NY 11801; Robert Miketich, 15403-25th Dr.,

Flushing, NY 11354; Victor H. Echeverri, 235 Burgundy E., Delray Beach, FL 33484;

Joseph F. Mancuso, 266 Buttonwood Dr., Paramus, NJ 07652; Paul S. Qassis, 600 Harbor

Blvd., Apt. 858, Weehawken, NJ 07086; and Gary S. Saggu, 280 Mulberry St., New York, NY 10012.

2.   This action involves insider trading by eight individuals in the common stock of Vital Signs, Inc. ("Vital Signs") prior to the July 24, 2008 announcement that the company would be acquired by GE Healthcare, a wholly owned subsidiary of the General Electric Company ("GE").  The price of Vital Signs' common stock increased to $73.11 on July 24 following the announcement, a premium of 26% over the closing price of $58.00 on July 23.

3.   John R. Easom ("Easom"), at that time Vital Signs' Executive Vice President, Global Business Development, signed on behalf of Vital Signs, a non-disclosure agreement ("NDA"), dated January 21, 2008, with GE Healthcare under which all information about the possible acquisition was to be kept confidential.  The NDA allowed the companies to negotiate a possible takeover of Vital Signs by GE.  Easom owed a fiduciary duty to Vital Signs and its shareholders to maintain the confidentiality of information regarding the negotiations between Vital Signs and GE.

4.   Easom knew that Vital Signs' CEO was meeting with GE's CEO on the morning of June 5, 2008 to finalize the acquisition deal.  Vital Signs' CEO returned from that meeting and told Easom and certain other senior Vital Signs senior managers and directors the agreed terms.  Easom then sent his cousin's husband, William Echeverri ("W. Echeverri"), a text message telling him the price at which Vital Signs shares would be acquired.  This information was both material and nonpublic.  At that time, W. Echeverri was a registered representative then working as a securities trader at a registered broker-dealer ("Broker-Dealer A").

5. As someone with several years' experience working for registered broker-dealers, W. Echeverri was aware that it is illegal to trade on material, nonpublic information. Nevertheless, the day after receiving the information from Easom, W. Echeverri began purchasing shares of Vital Signs, ultimately buying 9,800 shares at an average price of $56.82, for a total cost of $556,820.18. W. Echeverri sold his Vital Signs shares after the July 24 takeover announcement, making illicit profits of $150,121.19.

6. W. Echeverri also tipped five others about the impending Vital Signs acquisition: his brother, Victor H. Echeverri ("V. Echeverri"), and several friends, including Rory E. Tringali ("Tringali"), Robert Miketich ("Miketich"), Joseph F. Mancuso ("Mancuso") and Paul S. Qassis ("Qassis"). Each of W. Echeverri's tippees purchased shares of Vital Signs while in possession of the material, nonpublic information about the pending GE takeover, and each sold after the announcement of the takeover, for combined illicit profits of over $190,000. Each of W. Echeverri's tippees knew or should have known that the tip originated from an insider at Vital Signs in breach of a duty of confidentiality.

7. Qassis in turn tipped his friend and longtime supervisee Gary Saggu. Saggu purchased shares of Vital Signs while in possession of the material, nonpublic information of the pending GE takeover, which he sold after the takeover announcement for illicit profits of over $111,000. Saggu knew or should have known that the tip originated from an insider at Vital Signs in breach of a duty of confidentiality.

8. Some of the traders took steps to keep their trading secret. W. Echeverri traded through an outside account that he concealed from Broker-Dealer A, in violation of

that firm's policies and procedures. V. Echeverri placed his Vital Signs trades through an account controlled by his friend, Tringali.

9.  By engaging in this course of conduct, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] ("Exchange Act") and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Unless enjoined, Defendants are likely to commit such violations in the future.

10. The Commission seeks an officer and director bar against Easom, and permanent injunctions enjoining all the Defendants from further violations of the statute and rule they violated, disgorgement of their unlawful trading profits with prejudgment interest, civil monetary penalties, and any additional relief that the Court deems appropriate.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this matter pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].

12. Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the acts, practices, and courses of business alleged herein.

13. Venue is appropriate in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because a substantial portion of the conduct alleged in this complaint occurred within New Jersey.

14. At all relevant times Easom, W. Echeverri, Mancuso and Qassis lived in New Jersey. Easom worked at the Vital Signs headquarters located in New Jersey, and tipped

W. Echeverri from his office.  W. Echeverri tipped Mancuso, and Mancuso placed his illegal trades, in New Jersey.

## DEFENDANTS

15.     **John R. Easom**, age 54, is a resident of Garfield, New Jersey.  During the relevant period, Easom was the Executive Vice President, Global Business Development, for Vital Signs, and as such was one of five executive officers listed on the company's final annual report filed with the Commission.

16.     **William Echeverrri**, age 39, is a resident of Park Ridge, New Jersey.  During the relevant period, he was a registered representative, working as a trader at Broker-Dealer A.  His wife is Easom's cousin.

17.     **Rory E. Tringali**, age 40, lives in Hicksville, New York, and is unemployed.  He is a friend of V. Echeverri and Miketich.

18.     **Robert Miketich**, age 41, lives in Flushing, New York, and works as the president of a hair salon operated by his wife.  Prior to the relevant period, Miketich worked as a controller at a registered broker-dealer, but was discharged for failing to disclose an outside account or pre-clear his trades.  He is friends with Tringali.

19.     **Victor H. Echeverri**, age 44, is a resident of Delray Beach, Florida.  He is the brother of W. Echeverri, and is currently employed as a waiter.

20.     **Joseph F. Mancuso**, age 33, lives in Paramus, New Jersey.  He is a self-employed CPA, and has been friends with W. Echeverri since childhood.

21.     **Paul S. Qassis**, age 42, is a resident of Weehawken, New Jersey, and is currently unemployed.  During the relevant period he was the managing director for regulatory technology systems at the Financial Industry Regulatory Authority ("FINRA").

His work involved managing the team of programmers that developed computer applications used by the regulatory branch of FINRA and, prior to its creation, the New York Stock Exchange ("NYSE"). On May 26, 2010, FINRA terminated Qassis. He is a long-term friend of W. Echeverri, and the two once co-owned a sandwich shop. At FINRA and at NYSE he supervised and became friends with Gary Saggu.

22. **Gary S. Saggu**, age 43, is a resident of New York City, New York, and is currently unemployed. During the relevant period, he was a contract computer programmer for FINRA, and, prior to its creation, for NYSE. He left FINRA in May 2010. He reported to Qassis for the entire time he worked at FINRA and NYSE. During their time working together, Saggu and Qassis became friends.

## RELATED ENTITIES

23. **Vital Signs, Inc.**, was a New Jersey corporation headquartered in Totowa, New Jersey. During the relevant period, Vital Signs was a medical equipment manufacturing company. Vital Signs' shares were registered with the Commission pursuant to Section 12(g) of the Exchange Act and traded on the Nasdaq National Market. On July 24, 2008, Vital Signs announced that it would be acquired by GE for a price of $74.50 per share. The acquisition was completed in November 2008.

24. **GE Healthcare**, based in the United Kingdom, is a wholly owned subsidiary of GE (NYSE: GE). It is a developer and manufacturer of medical devices. GE Healthcare is not a publicly traded company.

## FACTUAL ALLEGATIONS

### Easom Tips William Echeverri

25.    Vital Signs and GE signed a January 21, 2008 non-disclosure agreement so that they could discuss GE potentially taking over Vital Signs. Easom, as Executive Vice President, signed the NDA on behalf of Vital Signs. Vital Signs' policies required Easom to keep material, nonpublic information confidential, and not to trade in the company's securities while in possession such information. As a long-term senior officer of Vital Signs, who was in charge of assessing and acquiring other companies, Easom knew of his duty not to disclose the potential takeover to anyone, as well as of his duty not to trade on insider information.

26.    On May 16, 2008 Easom used an electronic brokerage account to purchase 15 shares of Vital Signs at a price of $52.70 per share.

27.    At approximately 9:00 am on Thursday, June 5, 2008, Vital Signs' CEO and GE's CEO met in a hotel room in New York City to finalize the terms of the takeover. Each CEO agreed to recommend to his respective board that GE buy all outstanding shares of Vital Signs for $74.50 in a cash offer. Easom was told of the proposed takeover terms when Vital Signs' CEO returned to the office. Shortly thereafter, Easom sent W. Echeverri a text message in which he imparted the material, nonpublic information of the terms of GE's agreement to acquire Vital Signs. W. Echeverri knew or should have known that Easom was sharing this information in breach of his duty of trust and confidentiality owed to Vital Signs.

28.    On June 6, W. Echeverri began buying shares of Vital Signs, purchasing 3,000 shares for an average price of $56.49, for a total of $169,472.30. The next trading

7

day, W. Echeverri bought 2,000 more shares of Vital Signs at a cost of $113,630.35. W. Echeverri continued to purchase Vital Signs shares, and by June 30 he held 9,500 shares, at a total cost of $538,995.38. On July 8, he sold 385 shares to meet a margin call, but then purchased another 300 shares on July 11. On July 18, he sold another 111 shares to meet a margin call. On July 24, after the takeover was announced, he sold 6,000 of his remaining 9,304 shares for $437,198.05, and sold the remaining shares on the next two trading days for $241,561.40. In total, W. Echeverri made $150,121.19 on his insider trading.

29. As a registered representative and securities trader, W. Echeverri knew or was reckless in not knowing that it was illegal to use material, nonpublic information obtained in the breach of a duty of confidentiality to trade securities. W. Echeverri also knew or was reckless in not knowing that it was illegal to convey to others material, nonpublic information that was obtained in violation of a duty of confidentiality.

## William Echeverri Tips Five Others

30. On Friday, June 6, 2008, W. Echeverri talked to his friend Tringali twice. The first call, which began at 4:52 pm and lasted two minutes, was between W. Echeverri and Tringali. The second call, at 5:10 pm and lasting three minutes, was a three-way call among W. Echeverri, Tringali and a friend of Tringali's, Robert Miketich. During one or more of these conversations, W. Echeverri conveyed the material, nonpublic information that he had learned from Easom concerning GE's offer to acquire Vital Signs. The following trading day, Monday, June 9, Tringali and Miketich began buying shares in Vital Signs using the online brokerage account of Tringali's father, who had given his son full authority to trade in the account. Tringali, in turn, had given Miketich authority to make trades in his father's account. Tringali, who was unemployed at the time and had never

before purchased shared of Vital Signs, ultimately purchased 4,377 Vital Signs shares in his father's account for a total cost of $251,394.96. He held all but 303 of these shares until after the takeover was announced. He sold the 4,074 remaining shares on July 24 for total illicit profits of $62,184.75.

31. Tringali traded while in possession of the material, nonpublic information concerning GE's plans to acquire Vital Signs to trade in the securities of Vital Signs. Furthermore, he knew or should have known that the information originated from someone who breached a duty of trust and confidentiality owed to Vital Signs.

32. On June 11, 2008, W. Echeverri called his brother, Victor. During this conversation, W. Echeverri conveyed to his brother material, nonpublic information concerning GE's plans to acquire Vital Signs.

33. On June 13, 2008, V. Echeverri called his friend Tringali, asking Tringali to place trades in Vital Signs on V. Echeverri's behalf. V. Echeverri did so to conceal his insider trading in Vital Signs. Tringali agreed to help V. Echeverri try to conceal his trading by placing V. Echeverri's Vital Signs trades in Tringali's father's account.

34. On June 16, 2008, V. Echeverri wired $45,000 into a brokerage account held in the name of Tringali's father, and on the following day Tringali bought more than $45,000 worth of Vital Signs, buying 798 shares at $57.00 per share for V. Echeverri. On July 29, after his sales of all his Vital Signs holdings cleared, Tringali wired $57,000 back to V. Echeverri, representing V. Echeverri's initial investment of $45,000 plus illicit profits of $12,000. Tringali kept the remaining $477.16 of the illicit profits on V. Echeverri's trades.

35. V. Echeverri traded while in possession of the material, nonpublic information concerning GE's plans to acquire Vital Signs to buy Vital Signs securities. He also knew or should have known that the information originated from someone who breached a duty of trust and confidentiality owed to Vital Signs.

36. In addition to placing Vital Signs trades in Tringali's father's account, Miketich also traded in his own accounts. As with his trading in the Tringali account, Miketich began buying Vital Signs in his own accounts June 9, 2008, the first trading day after he spoke with W. Echeverri. To try to conceal his suspicious trading, Miketich bought and sold Vital Signs regularly between June 9 and the date of the takeover announcement, but he was always sure to retain shares in the company, never selling his entire position. On the day the takeover was announced, Miketich owned 2,100 shares of Vital Signs, which he immediately sold for illicit profits of $31,455.

37. Miketich traded while in possession of the material, nonpublic information concerning GE's plans to acquire Vital Signs to buy Vital Signs securities. He also knew or should have known that the information originated from someone who breached a duty of trust and confidentiality owed to Vital Signs.

38. Before the announcement of the GE offer, Miketich recommended to two relatives that they purchase shares of Vital Signs. Both did so, selling their shares after the GE takeover was announced for total profits of $37,155.48.

39. At 12:12 pm on June 26, 2008, W. Echeverri spoke for two minutes with his longtime friend Joseph Mancuso, followed by another two-minute call the next day at 11:08 am. During one or both of these conversations, W. Echeverri passed along the material, nonpublic information concerning GE's plans to acquire Vital Signs. Three days

later, Mancuso, having taken all available funds out of his home equity line of credit, purchased 3,800 shares of Vital Signs for a total cost of $217,100.18. Mancuso was unemployed at the time, had never purchased Vital Signs before, and had not traded in any equities for the preceding four years. Mancuso sold his Vital Signs shares after the takeover was announced, making total illicit profits of $61,367.01.

40. Mancuso traded while in possession of the material, nonpublic information concerning GE's plans to acquire Vital Signs to buy Vital Signs securities. He also knew or should have known that the information originated from someone who breached a duty of trust and confidentiality owed to Vital Signs.

41. At 4:33 on June 26, 2008, W. Echeverri spoke for three minutes with his longtime friend and former business partner Paul Qassis. That call was followed by another call between W. Echeverri and Qassis at 4:56 pm, lasting one minute. During one or both of these conversations, W. Echeverri conveyed to Qassis the material, nonpublic information concerning GE's plans to acquire Vital Signs. The next day Qassis began buying Vital Signs, purchasing 1,000 shares on June 27, and another 500 on July 10, for a total cost of $87,428.27. Qassis had never before purchased Vital Signs shares, and had purchased no other shares since December 2007. He sold all 1,500 Vital Signs shares on the day the takeover was announced for total illicit profits of $22,167.64.

42. Qassis traded while in possession of the material, nonpublic information concerning GE's plans to acquire Vital Signs to buy Vital Signs securities. He also knew or should have known that the information originated from someone who breached a duty of trust and confidentiality owed to Vital Signs.

### Qassis Tips Saggu

43. On June 27, 2008, Qassis' friend and colleague Gary Saggu also began purchasing shares of Vital Signs. At that time, Saggu had worked for Qassis for several years and the two had become good friends. During one or more of their in-person conversations June 26 or 27, Qassis conveyed to Saggu the material, nonpublic information he had learned from W. Echeverri concerning GE's plans to acquire Vital Signs. Between June 27 and July 23, Saggu purchased 7,545 shares of Vital Signs for a total cost of $437,415.32. He held the shares until after the takeover was announced, when he sold all his holdings for total illicit profits of $111,949.29. Saggu had never purchased Vital Signs before. The Vital Signs trading was unusual for Saggu, who, although a frequent trader, was in the practice of selling his holdings very quickly, rather than holding them for weeks, as he did with Vital Signs.

44. Saggu traded while in possession of the material, nonpublic information concerning GE's plans to acquire Vital Signs to buy Vital Signs securities. He also knew or should have known that the information originated from someone who breached a duty of trust and confidentiality owed to Vital Signs.

45. By tipping W. Echeverri, Easom received a personal benefit by conferring a gift upon a friend, relative or business relation.

46. By tipping V. Echeverri, Tringali, Miketich, Mancuso and Qassis, W. Echeverri received a personal benefit by conferring a gift upon a friend, relative or business relation.

47. By tipping Saggu, Qassis received a personal benefit by conferring a gift upon a friend, relative or business relation.

## **CLAIM FOR RELIEF**

### **Violations of Section 10(b) of the Exchange Act**

48. Paragraphs 1 – 47 are re-alleged and incorporated herein by reference.

49. Defendants, by engaging in the conduct described above, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

    a. employed devices, schemes or artifices to defraud;

    b. made untrue statement of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; or

    c. engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

50. By engaging in the foregoing conduct, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

    a) Permanently enjoin Defendants from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

    b) Order each defendant to disgorge all profits from their unlawful trading in Vital Signs securities, together with prejudgment interest;

c) Pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. §78u-1];

d) Bar Easom from serving as an officer or director of a publicly traded company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)]; and

e) Grant such other and further relief as this Court deems necessary and appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

A jury trial is demanded on all issues so triable.

Dated: December 16, 2011

| | |
|---|---|
| Of Counsel: | Respectfully submitted, |
| | |
| Antonia Chion | /s/ James A. Kidney |
| M. Alexander Koch | James A. Kidney |
| Heidi H. Mayor | Assistant Chief Litigation Counsel |
| | 100 F Street, N.E. |
| | Washington, D.C. 20549-5949 |
| | (202) 551-4441 |
| | (202) 772-9362 |
| | KidneyJ@sec.gov |
| | |
| | Attorney for Plaintiff |
| | Securities and Exchange Commission |

## Certification

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

/s/ James A. Kidney
James A. Kidney
Attorney for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-5949